## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOAN CLARK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-01119** |
| | ) | **Judge Aleta A. Trauger** |
| **UNUM LIFE INSURANCE COMPANY** | ) | |
| **OF AMERICA and UNUM GROUP** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff Joan Clark initiated this action against defendants Unum Life Insurance Company of American and Unum Group Corporation (collectively referred to herein, in the singular, as "Unum" or "the defendant") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, for judicial review of Unum's decision denying long-term disability ("LTD") benefits under an employee welfare benefit plan ("the Plan"), sponsored and maintained by Clark's former employer, Aerospace Testing Alliance ("ATA"). Clark and Unum have filed cross motions for judgment on the administrative record. (Docket Nos. 17, 19.) Clark has filed a Response to Unum's motion (Docket No. 24), to which Unum has filed a Reply (Docket No. 25); Unum has filed a Response to Clark's motion (Docket No. 23), to which Clark has filed a Reply (Docket No. 26). For the reasons set forth herein, Clark's motion will be granted, Unum's motion will be denied, and Clark's claim will be remanded to Unum for further consideration.

## BACKGROUND

Clark worked for ATA as an instrument technician at Arnold Air Force Base in Tullahoma,

Tennessee for almost thirty-three years. Her position required her to perform a variety of challenging physical tasks, including scaling ladders, pulling and carrying heavy objects, and installing wires into small connectors. Approximately halfway into her career, Clark was diagnosed with systemic lupus erythematosus ("SLE" or "lupus") and, later, with fibromyalgia and neuropathy. These conditions caused symptoms including fatigue and chronic pain. Clark also suffered from sleep apnea and essential tremor, which caused her hands to shake. In 2012, following a flare of her SLE, Clark was forced to stop working. She applied for and received short-term disability benefits from Unum, the insurer responsible for benefits determinations and payments on behalf of ATA. Her treating physician, Dr. Albert Brandon, recommended that Clark take a medical retirement. Clark rejected his advice and continued to work until 2016.

## I.   Applicable Plan Provisions

Effective October 1, 2011 Unum issued Group Policy No. 225814 002 ("Policy") to ATA to fund short-term and LTD benefits for ATA's employees. (Administrative Record, Part I, Doc. No. 14-1.[1]) The Policy is an "employee welfare benefit plan," as that term is defined by ERISA, 29 U.S.C. § 1002(a).

For purposes of LTD benefits, the Policy defines "disability" as follows:

You are disabled when Unum determines that:

– you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

---

[1] The Administrative Record has been filed with the court at Docket Numbers 14-1, 14-2, 14-3, 14-4, 14-5, and 14-6. The claim file upon which Unum's decision was based makes up Docket Numbers 14-2, 14-3, 14-4, and 14-5. The pages within that range have been cumulatively numbered for purposes of ease of reference, but those page numbers are, unfortunately, almost completely hidden by the court's CM/ECF stamp. The court will therefore refer to the pages within the Administrative Record by the docket number assigned by CM/ECF and the page within that docket number.

– you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative.

(Docket No. 14-1 at 17 (emphasis in original).)

The Policy defines "material and substantial duties" to mean duties that "are normally required for the performance of your regular occupation" and that "cannot be reasonably omitted or modified." (*Id*. at 33.) The term "regular occupation" refers to the occupation the employee is "routinely performing" at the time disability begins; however, Unum looks at the occupation "as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (*Id*. at 35.)

The Policy clearly "delegates to Unum . . . discretionary authority to make benefit determinations under the Plan." (*Id*. at 42.) "Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan. All benefit determinations must be reasonable and based on the terms of the Plan and the facts and circumstances of each claim." (*Id.*)

## II.     Initial LTD claim and denial

Clark claims to have become disabled from working in her lead instrument technician

position beginning February 15, 2016, at which time she was 59 years old.  She was covered under the Policy.  In accordance with Policy requirements, she initially filed another claim for short term disability based on her diagnoses of SLE, fibromyalgia, and neuropathy.  (Administrative Record, Part II, Docket No. 14-2 at 92.)  She identified Dr. Brandon as her treating physician.  Although the form requested information about all "current medical treatment providers" (*id.*), Clarke apparently did not disclose any other medical providers.

On the Attending Physician Statement, Dr. Brandon identified Dr. Raymond Capps, a neurologist, as another medical provider of Clark's.  (Docket No. 14-2 at 97.)  Dr. Brandon noted that he had personally treated Clark in the past and that she was experiencing a "flare" of her lupus, complicating her fibromyalgia symptoms.  (*Id.*)  He stated that, as a result of the "flare," "[s]he currently cannot think straight & therefore needs not to work."  (*Id.*)  He identified the clinical or diagnostic findings as including "multiple tender points" on her spine and muscle spasms of the muscles from the thoracic to the lumbar spine.  By observation, she "appears fatigued" and pale, with increased pain and joint pain.  (*Id.* at 97.)  He opined that Clark was precluded from working overtime, climbing, stooping, or standing.  (*Id.* at 98.)  He explained that she "suffers from lupus and fibromyalgia" with "intermittent exacerbation" of her symptoms, which are "aggravated by stress & long hours."  (*Id.*)  He noted that she "also has neuropathy in her lower extremities, which make[s] it uncomfortable for her to climb."  (*Id.*)  He added that she requires "[p]eriodic periods of increased rest and prescription medications to help combat the exacerbations."  (*Id.*)  He provided a checklist of lupus symptoms and noted that, among many other symptoms, Clark was experiencing extreme fatigue.  (*Id*. at 100.)

On March 7, 2016, Dr. Brandon completed and returned to Unum a Residual Functional Capacity Form, on which he stated that extreme fatigue unrelieved by rest and pain related to her

diagnosed conditions of SLE, fibromyalgia, and neuropathy prevented her from performing her job duties.  (*Id*. at 111.)  He identified the objective findings and laboratory results supporting his opinions as including positive ANA, low white blood cell count, and elevated CRP (c-reactive protein).  (*Id.*)  He described Clark's treatment as including prednisone treatment and antibiotics. He noted that SLE is "progressive in nature" and "unpredictable" but believed that her disability related to the condition would endure for more than a year.  (*Id.* at 112.)

He noted that, functionally, Clark could stand and sit only for short periods of time, could walk no further than half a block at a time, was limited in reaching, and could lift less than five pounds only frequently or occasionally.  (*Id*. at 113.)  He noted additional symptoms, including frequent dizziness and headaches, essential tremors, fatigue, numbness in hands and feet, and sleep apnea.  (*Id*. at 114.)  He further noted that Clark suffered chronic, daily pain, varying in intensity, in the form of arthralgia, muscle pain, stiffness, chronic headaches, and neuropathy.  (*Id*.)  He rated Clark's credibility as excellent, noting that she had been diagnosed with SLE in 1991 and that the fatigue and pain related to her diagnoses had gradually become debilitating over the past five years. (*Id.* at 115.)

On April 15, 2016, Unum notified Clark that she was approved for short-term disability benefits through that date, and, if she was not able to return to work after that date, requested medical records and restrictions supporting her claim of disability from March 8, 2016 forward. (*Id*. at 147.)  In response, Clark provided medical records from Dr. Brandon.  Dr. Brandon's office visit note from Clark's March 7, 2016 visit stated that the "reason for appointment" was to refill Clark's Cymbalta prescription and "Talk with Physician about disability."  (*Id*. at 119.)  The reported symptoms and physical exam were largely unremarkable, except that Dr. Brandon noted decreased range of motion in Clark's cervical spine and "cognitive function intact but problems

with forgetfulness." (*Id*.) Clark was continued on numerous medications, including Tramadol, Cymbalta, Metoprolol, and Lyrica, among others, and directed to follow up in two months. Clark returned to Dr. Brandon on April 15, 2016, but her complaints were focused on seasonal allergy symptoms and a urinary tract infection. (*Id*. at 134–35.) On May 16, 2016, Dr. Brandon noted that Clark was "still unable to work due to extreme weakness," but otherwise the treatment note was consistent with the preceding months' notes. (*Id*. at 141–42.) Dr. Brandon also filled out paperwork related to Clark's disability claim, including a form documenting that she was not released to return to work at ATA. (*Id*. at 143.) On this form, he described her as limited to: short durations of activity followed by rest; lifting no more than 15 pounds, with no stooping; standing for short periods of time; walking "for therapy and as tolerated"; sitting in chairs for short periods; driving short distances; unable to climb, tolerate heat, bend or squat; and climbing stairs infrequently. (*Id*.) He noted that she had "a problem with balance and dizziness and concentrating due to extreme fatigue." (*Id*.)

On May 27, 2016, Unum claim administrator Stephanie Clabough documented a telephone call on that date with Clark, in which Clark clarified her last date worked and stated that Dr. Brandon had advised her to stop working. (*Id*. at 217.) She acknowledged that she had a previous short term disability claim but had returned to work in September 2015, with no restrictions, and that she had continued to work full time without restrictions or limitations up until February 12, 2016. (*Id*.) She stated that she was not being accommodated prior to her last day worked and that Dr. Brandon had not provided her with any work-related restrictions and limitations prior to that date. (*Id*.) She explained that, when she returned to work in September 2015, she was still feeling poorly amidst a Lupus flare. (*Id*. at 218.) She noted that Dr. Brandon did not want her to return to work but that she was determined to do so. She stated that "it just got to where she could not

handle it any more in 2/2016 with how she was feeling and what her work requires. Her symptoms [were] overall pain, neuropathy in her feet . . . that had gotten a lot worse," causing her to take time off from work. (*Id.*) In February 2016, she was feeling sick and dizzy with extreme fatigue. (*Id.*) As of May 26, 2016, she continued to have symptoms described as "a combination of everything. Her current symptoms are severe back pain, really bad headaches and her back has been having spasms . . . neuropathy in her hands and feet and . . . carpal tunnel syndrome in her hands." (*Id.*) She did not yet need surgery but both hands were "weak." (*Id.*) In addition, her knees were bothering her, likely from arthritis and lupus. The primary symptoms preventing her from working were "debilitating fatigue, pain and feeling like she ha[d] the flu." (*Id.*)

The plaintiff identified Dr. Brandon as the only treating source giving her work-related restrictions and limitations. (*Id.*) She noted that she had last seen her neurologist, Dr. Capps, several months prior and would make an appointment to see him again. (*Id.*) She identified Dr. Amy Rudder as her chiropractor, for whom she provided a phone number. (*Id.*) She stated she had not asked for restrictions and limitations from Dr. Rudder. (*Id.*) She identified Dr. James George as a pain specialist whom she had last seen on May 10, 2016, and with whom she had another appointment scheduled for June 7, 2016. (*Id.*) He had not provided restrictions and limitations, as he did not "deal with the disability." (*Id.* at 218–219.)

Clark noted that, in May 2016, Dr. Brandon had started her on Baclofec and that she had previously taken Plaquenil but stopped because of a "build up of toxicity in her eyes." (*Id.* at 219.) Her treatment for lupus subsequently consisted of prednisone shots. (*Id.*) Clark described her typical day as varying from day to day. (*Id.* at 220.) Some days she felt relatively well and was able to be more active. (*Id.*) On such good days, she tried to walk, do light jobs around the house, and drive short distances. (*Id.*) However, on "other days she [didn't] feel like getting out of bed."

(*Id*.)  She mentioned that climbing stairs was difficult due to the pain in her knees.  (*Id*.)  She could climb but not repetitively.  (*Id*.)  She described her job as requiring "a lot of climbing and installing instrumentation for testing purpose," working in extreme temperatures, and working long hours.  (*Id*.)  She also worked with computers and completed calibrations.  (*Id*. at 221.)

On June 1, 2016, Unum sent Clark a letter requesting additional information and notifying her of her right to request an independent medical examination, "should opinions differ on the degree of medical impairment."  (*Id*. at 229.)  The same letter also included Unum's definition of disability and what type of information Clark needed to provide in order to prove her claim of disability.  (*Id*.)

Unum's internal notes reflect that Clabough, the claim administrator, forwarded Clark's file with all of the information provided by Clark for a "clinical review" and to a vocational specialist for a determination of the physical requirements of her occupation, as performed in the national economy.  (Administrative Record, Part III, Docket No. 14-3 at 27.)  Amy Oliver, an in-house registered nurse at Unum, reviewed the file and concluded that the record did not support disability.  (*Id*. at 29.)  Oliver noted that it was "unclear what changed" for Clark as of the disability onset date, as there were no diagnostic tests or laboratory results that suggested a worsening of her symptoms and conditions.  (*Id*. at 28–29.)  In addition, Catherine C. Rogers, occupational specialist, concluded that, based on Clark's own description of her job, the occupation as performed in the national economy qualified as "light" work, requiring the exertion of up to twenty pounds of force, frequent sitting, reaching, handling and fingering, and occasional walking, standing, stooping, and crouching.  (*Id*. at 33-35.)  Rogers found that the material and substantial duties of Clark's job included "[d]isassembl[ing] instruments and equipment, using hand tools, and inspect[ing]components for defects"; "[m]easur[ing] parts for conformity with specifications,

using micrometers, calipers, and other precision instruments"; and "[d]evis[ing] formulas to solve problems in measurements and calibrations." (*Id*. at 35.)

At this point, Unum determined that it needed additional information and sent Clark a letter, dated June 29, 2016, giving her notice that it needed more time to assess her claim and that its medical reviewer would need to contact Dr. Brandon to further discuss her medical condition. (*Id*. at 39.) The record further documents Unum's attempts to contact Dr. Brandon by telephone and letter. Specifically, the record includes a letter dated June 30, 2016 from Dr. Trent Thomas— an in-house board certified internist for Unum—to Dr. Brandon, noting that he had called Dr. Brandon's office that day and spoken with a receptionist. (*Id*. at 46.) The letter requested a return call, as well as Dr. Brandon's response to several questions. (*Id*.) The letter summarizes Clark's medical history and symptoms, based on the records in the file as of that date. (*Id*.) Dr. Thomas specifically noted:

> After review of the available medical records, I note no clear change/worsening in Ms. Clark's clinical/functional status around the time she ceased work (i.e. as compared with previous when she continued in her occupational duties), and would appreciate your further insight into her current functionality.

(*Id*.) He asked whether Dr. Brandon believed that Clark had the functional capacity to perform light, full-time work requiring the exertion of up to 20 pounds of force, occasional standing, walking, stooping, and/or crouching and frequent sitting, reaching, handling and fingering. (*Id*. at 47.) Dr. Thomas asked Dr. Brandon, if he did not find that Clark had the functional capacity to perform the enumerated tasks, to discuss how the "specific physical examination and/or diagnostic findings are affecting her current functional capacity." (*Id*.)

The record reflects additional attempts to contact Dr. Brandon on July 13, 2016. (*Id*. at 54.) As a result of Dr. Brandon's failure to respond to Dr. Thomas's request for additional

information, Dr. Thomas rendered his medical opinion, finding—upon a review of all of Clark's conditions individually and collectively, and with a reasonable degree of medical certainty—that she did not meet the Policy's definition of disability. (*Id*. at 61.) Specifically, while the medical records documented a history of SLE, fibromyalgia, neuropathy, lumbar degenerative disc disease, and essential tremor, all predating the disability onset date, Dr. Thomas found that the records did not document a significant clinical worsening or change of Clark's conditions around the alleged disability onset date to support "long-term functional loss/impairment from [disability onset date] onward" and that the reported severity of symptoms and functional impairment was out of proportion to documented findings on physical examination and diagnostic study. (*Id*.) He stated:

- o Available records do not document physical examination findings (e.g. skin rash, synovitis, etc.) suggestive of active/flared lupus or connective tissue disease.

- o Serial examinations have not otherwise documented significant/consistent musculoskeletal (e.g. muscle loss/atrophy, spinal/joint ROM abnormalities, synovitis) or neurologic . . . deficits to suggest the claimant's total functional impairment, or to support proffered R/Ls [restrictions and limitations] (e.g. Dr. Brandon, 3/7/2016, 4/15/2016, 5/16/2016, 6/16/2016).

- o While acknowledging noted decreased cervical spine range of motion and/or tender trigger points as is consistent with the claimant's known history pre-dating DOD, such findings would not be expected to result in the claimed degree of ongoing or long-term functional impairment, especially given preserved/intact musculoskeletal/motor function as in this case.

- o In contrast to reported pain severity, available records fail to document evident/observed pain behaviors at times of office visits, typically noting "no acute distress."

- o Available records fail to document the claimant's need for or use of any assistance device for ambulation, balance issues, or pain control to date.

- o Lumbar MRI of 7/2015 (again pre-dating DOD, at which time claimant persisted in her occupational duties) reveals age-consistent degenerative changes, otherwise [insignificant findings].

o  Available records otherwise include no laboratory testing . . . in assessment of reported symptoms (e.g. fatigue, pain, cognitive issues), or in support of proffered restrictions/limitations.

o  Of note, while available records reference "positive ANA, low white blood cell count, elevated C-reactive protein" as might be consistent with the known history of [SLE], such lab reports are not included within medical file for review. As such, I am uncertain as to the date/timing of referenced lab findings. I will be happy to consider/review such findings if/when they become available.

The claimant's ongoing treatment efforts are not consistent with the stated severity, persistence and/or impact of the claimed medical symptoms:

o  Available records do not document significant/escalating use of anti-inflammatory or narcotic pain medications in attempts to control reported pain symptoms.

o  Available records fail to document any increase in intensity of treatment around DOD to suggest significant clinical/functional change or worsening at that time, otherwise without current/ongoing treatment/management of [SLE] (e.g. medications, Rheumatology referral/follow-up) other than episodic steroid injections per AP Brandon (e.g. 4/15/2016).

o  Available records document stable ongoing treatment/management of fibromyalgia/chronic pain symptoms, including use of Cymbalta and Lyrica, otherwise without significant dose adjustments (i.e. Cymbalta increased from once to twice daily, 3/2016) of these medications from 3/2016 onward.

o  The majority of recent office visits with AP Brandon . . . focus on discussion/paperwork regarding "disability," as opposed to ongoing workup and/or management/treatment of reported disabling medical conditions.

In specific consideration of reported complaints/conditions, I do not find documented evidence of ongoing functional impairment related to:

o  [SLE], as available records document the claimant's history of lupus dating to 1997, otherwise without documentation of physical examination deficits/abnormalities or recommendation for change in treatment/management of lupus from pre-DOD to current to suggest/support any significant change in functional status relating to this diagnosis.

o  Fibromyalgia, as this condition would not be expected to result in any significant ongoing or long-term functional loss/impairment, and is typically treated with recommendation for increased (i.e. as opposed to decreased or no) physical activity.

o Neuropathy, as available records fail to document any motor/sensory deficits consistent with this diagnosis, nor include any diagnostic studies (e.g. EMG/nerve conduction study) in confirmation of this diagnosis.

o "Disc degeneration in back," as records fail to document any significant physical/neurological examination deficits (e.g. motor/sensory deficits, abnormal gait, use of assistive device) to suggest/support the claimed degree of functional impairment relating to this condition.

§ Per 5/27/2016 Initial Call, AP Dr. James George treats claimant for "pain," otherwise without restrictions/limitations from this treatment provider.

§ While records reference follow-up with AP George from 9/2015 to current, such treatment notes are not included for review. However, given preserved neurologic/motor function as above, and no restrictions/limitations from this provider, OSP [Dr. Thomas] feels adequate information is otherwise contained within medical file to arrive at conclusions below. I will be happy to review records per AP George if/when they become available.

o Carpal tunnel syndrome, as available records document no specific physical/neurologic examination deficits . . . to suggest/support ongoing or long-term functional impairment relating to this condition.

§ While records referenced prior EMG/nerve conduction study . . . , such report is not included for review.

o Sleep apnea, as available records fail to document any evident/observed symptoms relating to this condition . . . or specific treatment (e.g. CPAP) to date.

o Dizziness, as records fail to document any significant evaluation . . . of this complaint, abnormal physical findings . . . , or specific recommendation for treatment to date.

(*Id*. at 61–63.) Dr. Thomas also found that Clark's reported physical activities were not consistent with the claimed level of functional impairment because she reported that, "on a good day," she could walk a little, do light housework, and drive short distances, climb stairs but not repetitively, and lift no more than twenty pounds. (*Id*. at 63.) He also found that no impairment based on cognitive difficulties or behavioral health conditions was documented in the medical records. (*Id*.)

Dr. Thomas also noted that he had considered the utility of an independent medical examination but believed there was adequate information in the file for him to make his assessment. (*Id.*)

He concluded:

The available medical evidence does not support stated R/Ls as stated per AP Brandon for any time period . . . because the documented physical examination findings, diagnostic study findings, and ongoing intensity of treatment are not consistent with the claimed degree of functional impairment, and records are otherwise without documentation to suggest significant change in clinical/functional status from pre-DOD (i.e. at which time the claimant persisted in her occupational duties) to current, with stable treatment/management of chronic medical conditions, including systemic lupus erythematosus and/or fibromyalgia, during this time.

Therefore, after review of the available medical information/records, it is my opinion the medical evidence is most consistent with the claimant's capacity to perform full-time functional demand from DOD to ongoing to include at least:

- o Exerting up to 20 pounds of force;
- o Frequent sitting, reaching, handling, and/or fingering;
- o Occasional walking, standing, stooping, and/or crouching.

(*Id.* at 63–64.) Unum summarized Dr. Thomas's findings as follows: "In other words, Plaintiff had been working for many years with the same conditions, and the records did not indicate any significant change to warrant a disability finding as of the elimination period or thereafter." (Docket No. 18 at 8.)

Following Dr. Thomas's review, Dr. Norman Bress—an in-house physician at Unum with board certifications in internal medicine and rheumatology—conducted a second review of Clark's file. (Docket No. 14-3 at 65.) Unum requested the additional review because Dr. Thomas disagreed with Dr. Brandon. Dr. Bress similarly found a lack of support for the restrictions and limitations identified by Dr. Brandon. Specifically, Dr. Bress found Clark's SLE to be "mild or very well controlled" because, amongst other factors, Clark was not taking specific medication for SLE and was not followed by a rheumatologist. (*Id.* at 69.) He also noted that, while Clark fit the

criteria for fibromyalgia, it did not prevent her from performing her occupational demands. In support, he cited the following factors:

> There is no evidence of a flare of [fibromyalgia] symptoms at or around the date of disability to explain her cessation of work. No muscle weakness has been documented. There is no mention that the insured appeared fatigued or chronically ill on exam. No cognitive deficit was noted during any exams.

(*Id*. at 68.)

On July 28, 2016, Unum denied Clark's claim for benefits. (*Id*. at 77.) Based upon the in-house reviews conducted by Oliver, Dr. Thomas, and Dr. Bress, Unum made the following conclusions:

> Your physical examination findings, diagnostic study findings and ongoing intensity of treatment are not consistent with the reported degree of functional impairment. Your medical records do not provide documentation to suggest significant change in your clinical/functional status from prior to disability to the current, with stable treatment/management of chronic medical conditions, including systemic lupus erythematosus and/or fibromyalgia.

(*Id*. at 78.) Based on these conclusions, Unum determined that Clark has the capacity to perform her job full-time at functional demand level, including exerting up to twenty pounds of force, frequent sitting, reaching, handling and/or fingering and occasional walking, standing, stooping and/or crouching. (*Id*.)

### III. First appeal

On January 20, 2017, Clark submitted her formal appeal of Unum's denial. (*Id*. at 141.) Clark argued in her appeal letter that she was unable to perform the material and substantial duties of her job, that her condition had deteriorated over the preceding several years, and that her claim file included incorrect clinical findings. (*Id*. at 141–146.) In support of these contentions, she submitted the following documents: a letter from Dr. Brandon (*id*. at 181); a letter from Dr. Alan Elliott, Clark's rheumatologist (*id*. at 186); an affidavit from Robert Grimes, her former supervisor

14

(*id*. at 174); an affidavit by Clark submitted on her own behalf (*id*. at 166); additional records from Dr. Capps, including an August 24, 2016 Electromyography Nerve Conduction Studies Report ("Nerve Conduction Report") and results from a December 6, 2016 physical examination (*id*. at 187), and; a letter from Dr. Peter Donofrio, a neurologist who reviewed Clark's Nerve Conduction Report results (*id*. at 216).

Clark identified three specific clinical findings as incorrect.  First, Unum found that Clark's SLE was mild or well controlled because she was not taking medication for SLE.  (*Id*. at 69.)  In response, Clark cited Dr. Capps' records, which show that Clark was taking methylprednisolone for her SLE.  (*Id*. at 195.)  Dr. Donorfio also noted that Clark was prescribed depo-medrol suspension for injection and methylprednisolone for her SLE.  (*Id*. at 217.)  And Dr. Brandon reiterated that Clark had previously taken Plaquenil for her SLE but was forced to discontinue usage, due to side effects.  (*Id*. at 181.)

Second, Unum found that Clark's SLE was mild or well-controlled because she was not followed by a rheumatologist.  (*Id*. at 69.)  In response, Clark cited Dr. Brandon's letter, which states that Clark has been under the care of rheumatologists since her diagnosis in 1998.  (*Id*. at 181.)  In addition, Dr. Capps' records state that, in December 2016, Clark was under the care of a rheumatologist.  (*Id*. at 194.)  Dr. Elliott's letter confirmed that he was treating her in December 2016 (*Id*. at 186.)

Third, Unum found that Clark's disc degeneration in her back was not adequately documented.  (*Id*. at 62.)  In response, Clark cited a 2015 report from United Regional Medical Center that shows she has Lumbar Degenerative Disc Disease.  (*Id*. at 187.)  She also submitted results from a June 16, 2016 exam with Dr. Brandon, in which Clark exhibited spasms and multiple tender points in the lumbar area.  (*Id*. at 188.)  Finally, she stated in her affidavit that her back

problems led to restrictions at work, which prevented her from performing on catwalks. (*Id*. at 172.)

Clark also contested Unum's central finding that her condition had not deteriorated in the years preceding her benefits claim. Dr. Brandon explained at length how, in his view, Clark's condition had deteriorated in recent years. (*Id*. at 182.) Grimes similarly testified that Clark "was always very energetic and intense, until her Lupus progressed." (*Id*. at 175.) He noted that her health rapidly deteriorated in her last 12-18 months on the job, adding that she "would grow tired easily, often limping up and down stairs." (*Id*.) He testified that, toward the end of her employment, he "allowed her to take more and more time off work because of her weakened condition." (*Id*.)

Dr. Donofrio corroborated Grimes's observation that Clark's condition had worsened. A professor of neurology and director of the Neuromascular Division at Vanderbilt University Medical Center, Dr. Donofrio has worked as an instructor of neurology for nearly 40 years and has conducted research, published journal articles, and written textbook chapters on neuropathy and electromyography. He reviewed Clark's past and present medical history, nerve conduction studies from 2006 and 2015, a medical report by Dr. Brandon, a copy of Clark's job description, and the findings of the 2016 Nerve Conduction Report conducted by Dr. Capps, which found a worsening of Clark's neuropathy. (*Id*. at 216.) Dr. Donofrio confirmed Dr. Capps' findings and summarized the Nerve Conduction Report as follows:

> [Clark] returned on August 24, 2016 for follow-up nerve conduction studies with complaints of worsening gait and weakness in the legs. The study on that day showed worsening of her motor amplitudes and greater slowing of conduction velocity. F-waves were now absent in the right peroneal and left tibial nerves. They had been present during [Clark's] study in 2006. The official interpretation of the study on August 24, 2016 was progression and worsening of her neuropathy.

(*Id*.)  Considering the results of the Nerve Conduction Report in the context of Clark's other documentation, Dr. Donorfio offered the following assessment:

> This reviewer agrees that the patient has a peripheral neuropathy and there is verifiable progression since 2005 based on her nerve conduction study results of worsening amplitudes, slowing of conduction velocity, and absent F waves that were present in 2005.  Her diffuse neuropathy, most likely due to long-standing lupus, is confounded by carpal tunnel syndrome in both hands.  Patients with carpal tunnel syndrome usually have numbness of digits 1-3 of both hands, pain in the fingers and hands, and weakness of the thumb.  These features would interfere with fine manipulation of objects.  The tremor in her hands makes fine manipulation of small objects even more difficult.
>
> In conclusion, Mrs. Clark is disabled from her position as an instrument technician 1 for the reasons identified above.  Nerve conduction studies performed in 2016 show clear worsening since 2005 and now there is the superimposition of carpal tunnel syndrome affecting both hands.

(*Id*. at 217.)

Unum referred the appeal to Dr. Jonathan McCallister, an in-house, board certified internist.  Dr. McCallister determined that Clark's reports of functional loss were not consistent with her file information and medical records.  (Administrative Record, Part V, Docket No. 14-5 at 38.)  He further concluded that Clark's medical records did not reflect an inability to perform light duty work, the category in which her position falls in the national economy.  (*Id*. at 40.)  Dr. McCallister made the following specific findings:

o Laboratory data is consistent with a diagnosis of SLE, showing elevated ANA and mildly elevated DSDNA, but inflammatory biomarkers such as CRP and sed rates have been consistently normal or only very mildly elevated for many years.  This finding is inconsistent with the presence of active inflammation.

o The medical records reflect certain tender points as well as occasional crepitus in the knee, but the records do not reflect consistent or ongoing evidence, upon physical examination, of swelling, deformity, effusion, edema, atrophy, weakness, significant decrease in range of motion of the extremities, synovitis or nodules.

o Plaintiff's treatment for SLE has been mild, having first been prescribed Plaquenil, a first line drug for mild SLE.  Prescription of that medicine was

discontinued due to side effects with Plaintiff's eyes. The medical records also reflect short courses of steroids as treatment for SLE, but no use of long-term steroid, narcotic pain medication or advanced medicines used to treat SLE.

o Plaintiff's fibromyalgia records are minimal, and include low dose Lyrica, which was prescribed for her neuropathy, and Cymbalta, the dosage for which has undergone minimal changes. No other medical trials or changes are recorded.

o No type of therapy (physical, occupational, aqua, chiropractic) or other noninvasive treatments for chronic pain are noted in the records.

o Plaintiff's MRI of her lumbar spine show only mild degenerative changes without noted formation or canal stenosis. Plaintiff was never referred to an orthopedic or neurosurgical specialist, nor do the records show any injections or non-invasive treatments to try to alleviate back pain.

o Plaintiff did not seek pain management care until late 2016, but prior to that date, no pain management care was sought, nor has Plaintiff been aggressively treated with pain medication.

o Plaintiff's records do not reflect emergency or urgent care.

o Knee pain is noted in both knees, having been treated with steroid injections, but there appears to be no historical record of knee pain, nor degeneration of the knee condition on exam, such as swelling, decreased range of motion, effusion.

o Plaintiff was never referred to an orthopedist for back or knee pain.

o No records were provided regarding imaging of Plaintiff's hands, wrists, ankles or feet, which would be consistent with inflammatory arthritis patients, and minimal office visits to a rheumatologist are noted, with a gap existing between early 2013-September 2016.

Plaintiff's neuropathy is documented as mild in her extremities, but there is no documentation regarding pain with light touch, weakness, atrophy, reflex changes, loss of two-point discrimination or other neurological abnormalities. According to the records, Plaintiff's neuropathy is well-controlled with low doses of Lyrica.

Further, Plaintiff's visits to the neurologist are only semi-annual.

o Plaintiff's essential tremor issue is documented in the neurological records as a mild resting tremor, but her primary care physician and rheumatology records do not consistently reflect this condition. The tremor issue has been well-controlled with no changes to medication or treatment.

18

o Plaintiff's medical records do not reflect any cognitive testing or treatment regarding alleged cognitive issues. The only cognitive notation is with regard to occasional memory loss. Plaintiff continues to drive and handle daily tasks such as shopping and bill payment.

o Plaintiff's carpal tunnel condition is described as mild via her EMG/NCV testing, and she has been conservatively treated for that condition through the use of splints. No orthopedic or neurologic surgeon has been consulted nor has Plaintiff undergone any injection therapy for the condition. The medical records do not reflect thenar atrophy, hand weakness or sensory loss of the hands on physical examination, nor do they reflect any therapy for the condition.

(Docket No. 18 at 14 (citing Docket No. 14-5 at 39–40).) On April 4, 2017, Unum issued its written decision denying Clark's appeal. (Docket No. 14-5 at 47.) Unum noted that an in-house vocational specialist, Richard Byard, completed an occupational analysis and found that Clark's position of lead technician, as performed in the national economy, requires the following:

Physical demands:

- Occasional lifting, carrying, pushing, pulling up to 20 pounds of force
- Frequent sitting, reaching, handling and fingering
- Occasional walking, standing, stooping and crouching

Cognitive demands:

- Attaining precise set limits, tolerances and standards
- Performing a variety of other duties
- Making judgments and decisions

(Docket No. 14-5 at 49.) Based on Dr. McCallister's findings, Unum provided assertions underlying the basis for its decision to deny Clark's appeal, including the following:

The records do not reflect use of long-term steroids, narcotic pain medications, biologic agents, Methotrexate, Cyclosporin, or other advanced agents used to treat SLE.

(*Id*. at 49–50.)

There has not been ongoing or consistent treatment with physical therapy, occupational therapy, aquatherapy, bio-feeback, **chiropractic therapy**, or other

non-invasive treatment methods for chronic pain.

(*Id*. at 50 (emphasis added).)

> Ms. Clark has only minimally been evaluated by her rheumatologist, Dr. Elliott, and he did not see her around the time she stopped working in February 2016. There is a gap in treatment from early 2013 until she was seen on September 12, 2016 when she was "self referred for evaluation of a history of lupus." This lack of rheumatology treatment/follow-up is inconsistent with a severe rheumatologic conditions [sic].
>
> . . .
>
> Office records inconsistently document mild decreased sensation of the lower extremities but do not reflect the presence of hyperpathia (pain with light touch), weakness, atrophy, reflex changes, loss of two point discrimination, or other neurologic abnormalities.
>
> . . .
>
> Ms. Clark's neuropathy has been well controlled on low dose Lyrica without the need for increasing dosage of this medication, changes to alternative medications, or the addition of other medications. The records do not reflect use of narcotic pain medications. Referral to pain management did not occur until late 2016, well after your client stopped working.
>
> . . .
>
> Your client is seen by neurology infrequently, approximately every six months. More frequent follow-up would be expected were her neuropathy considered severe or worsening. At her December 6, 2016 appointment, no return appointment was scheduled according to the office note.

(*Id*.)

## IV.    Second appeal

On April 28, 2017, Clark filed her formal second appeal. (*Id*. at 87.) Clark provided additional records in support of her second appeal. These records included: another letter from Dr. Elliott (*id*. at 92); another letter from Dr. Brandon (*id*. at 160); a letter from Clark's chiropractor, Dr. Amy Rudder (*id*. at 169); records from a rheumatologist, Dr. Robert LaGrone

(*id.* at 171); a second affidavit from Clark (*id.* at 178); and pain management records from Jennifer Alexander, a nurse practitioner at Comprehensive Pain Specialists[2] (*id.* at 197). Through these materials, Clark refuted each of the underlying assertions excerpted above that Unum offered as justification for its denial of Clark's appeal:

- Contrary to Unum's claim that records do not reflect use of long-term steroids or narcotic pain medications, Dr. Brandon's letter confirms that Clark has a long-term prescription for Tramadol, a controlled pain medication. (*Id.* at 160.) Moreover, Dr. Brandon notes that Clark does not tolerate higher doses of prescribed medications as Lyrica, which would otherwise be used to treat her SLE. (*Id.* at 161.) Clark also testified in her affidavit that she had been on a long-term steroid treatment plan, but was forced to discontinue use at her doctor's recommendation after experiencing side effects including extreme nervousness and insomnia. (*Id.* at 178–79.)

- Dr. Rudder's letter confirms that she had provided Clark chiropractic treatment 33 times since 2011, contrary to Unum's claim that Clark had not received ongoing chiropractic treatment for chronic pain. (*Id.* at 169.)

- Dr. LaGrone's records confirm that Clark saw him four times between June 2014 and September 2016, contradicting Unum's assertion that there was a gap in Clark's rheumatological treatment during that period. (*Id.* at 171–74.)

- Contrary to Unum's claim that Clark was not referred to pain management until after she stopped working in late 2016, Clark provided documentation showing that she was referred to pain management on March 18, 2014 for low back and neck pain, on July 16, 2014 for headache, neck pain, and low back pain, and on November 25, 2014 for low back pain. In each of these visits, Clark's pain was reported as "fluctuating but always present." (*Id.* at 198–214.)

On May 5, 2017, Unum referred the second appeal to Dr. Scott Norris, an in-house board certified family and occupational physician, to determine whether Dr. McCallister's opinion was correct in light of Clark's supplemental records. (*Id.* at 190.) Dr. Norris found that "the additional

---

[2] The pain management records were added to the record by Clark in a May 19, 2017 supplemental letter. (Docket No. 14-5 at 196.)

medical evidence received does not contain clinical data that supports a different conclusion than Dr. McCallister stated in his . . . review." (*Id*. at 192.) Dr. Norris found that "[t]reatment referenced in the newly received records was generally [consistent with] descriptions of treatment noted in the prior file records." (*Id*. at 193.) On May 23, 2017, Unum denied Clark's second appeal. (*Id*. at 232.) Unum made the following findings:

> There were no new examination findings identified in these recent records relevant to Ms. Clark's clinical and functional status as of February 15, 2016 through the elimination period (a period of continuous disability that must be satisfied before benefits are payable) that ended May 15, 2016. Diagnostic testing/imaging and treatment were consistent with the prior medical data. New or revised opinions regarding impairment were not provided by Ms. Clark's medical providers. Dr. Brandon's prior opinion remains unchanged.

> Our Appeals reviewing doctor considered all your client's conditions individually and together, along with the opinions of Ms. Clark's treating providers. He determined that medical data does not reflect the expected frequency/intensity of treatment or the expected abnormalities on examination and testing commensurate with your client's reported level of impairment. He concluded that your client has the functional capacity to perform on a full-time basis the physical and cognitive/mental demands described on page three of the enclosed letter from February 15, 2016 forward.

(*Id*. at 233.)

On August 7, 2017, Clark filed suit in this court (Docket No. 1).

## LEGAL STANDARD

Judicial review of the denial of benefits under ERISA is *de novo*, unless the ERISA plan at issue gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the language of the plan grants the plan administrator discretionary authority to determine eligibility benefits or to construe plan terms, then the determination is reviewed under the highly deferential "arbitrary and capricious" standard. *Id.*; *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702,

710 (6th Cir. 2000). For the arbitrary and capricious standard to apply, "the plan must contain 'a *clear* grant of discretion [to the administrator] to determine benefits or interpret the plan.'" *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*) (quoting *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994) (emphasis in original)).

In the present case, the Policy clearly and unambiguously grants Unum discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the group policy. (Doc. No. 14-1 at 42.) *Cf. Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000) (applying arbitrary and capricious standard where the plan provided that the plan's administrator "shall have the discretionary authority to determine eligibility for benefits or to construed the terms of the Plan"). The court will therefore review Unum's decision under the "arbitrary and capricious" standard.

"The arbitrary or capricious standard is the least demanding form of judicial review of administrative action." *Davis By & Through Farmers Bank & Capital Trust Co. of Frankfort, Ky. v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)). A decision is not arbitrary or capricious if it is rational in light of the Plan's provisions. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). Stated differently, a claim administrator's decision is not arbitrary and capricious if it "is based on a reasonable interpretation of the plan." *Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933–34 (6th Cir. 2000). Moreover, a court must accept an administrator's rational decision, if it is not arbitrary or capricious, even in the face of an equally rational interpretation of a plan offered by a participant. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005) (citing *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004)).

The "arbitrary and capricious" standard of review "is not, however, without some teeth." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Deferential review does not mean *no* review, and deference need not be abject. *Id.* Under the "arbitrary and capricious" standard, the district court must "review the quality and quantity of the medical evidence and the opinions on both sides of the issues," and it generally must uphold an administrator's decision if that decision is shown to be "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." *De Lisle v. Sun Life Assurance Co. of Can.*, 558 F.3d 440, 444 (6th Cir. 2009) (citations omitted).

Deferential review is tempered to some extent, however, in the presence of a conflict of interest. "When the same entity determines eligibility for benefits and also pays those benefits out of its own pocket, an inherent conflict of interest arises. In close cases, courts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009) (citing *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2345 (2008); *De Lisle*, 558 F.3d at 444). The degree of weight accorded this factor will vary depending on the circumstances, as the Supreme Court has recognized:

> The conflict of interest at issue . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn*, 128 S. Ct. at 2351.

## ANALYSIS

To determine whether the denial of benefits was arbitrary or capricious, courts must consider the "guideposts that have been established by [the Sixth Circuit] with regard to ERISA benefit determinations." *Filthaut v. AT&T Midwest Disability Benefit Plan*, 710 F. App'x 676, 681 (6th Cir. 2017) (quoting *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876–77 (6th Cir. 2006)). In *Shaw v. ATT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538 (6th Cir. 2015), the Sixth Circuit adopted a four-factor test for determining whether a plan administrator defendant arbitrarily and capriciously denied the plaintiff long-term disability benefits: whether the administrator "ignored favorable evidence submitted by [the plaintiff's] treating physicians, selectively reviewed the evidence it did consider from the treating physicians, failed to conduct its own physical examination, and heavily relied on non-treating physicians." *Id.* at 547. The Sixth Circuit noted that, although "none of the factors alone is dispositive," taken together "they support a finding that [the administrator] did not engage in a deliberate and principled reasoning process." *Id.* at 551 (quoting *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 396 (6th Cir. 2009)). The court will address each factor in turn.

### a. Ignoring favorable evidence

A plan administrator acts in an arbitrary and capricious manner when it ignores important pieces of evidence. *Id.* at 548 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)) ("[Administrators] 'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.'"). Clark contends that Unum ignored favorable evidence that her condition had worsened prior to seeking LTD. Unum's finding that Clark's condition had not worsened was central to its denial of benefits. Indeed, Unum repeatedly emphasized the point in its briefing. *See* (Docket No. 23 at 5 ("[Clark's] claim for disability benefits was denied because there was not sufficient proof that her multiple conditions, although

verifiable, had meaningfully changed in terms of severity or treatment to warrant disability benefits as compared with the previous five years in which [Clark] worked full-time in her regular occupation with those same conditions.").); *see also* (Docket No. 18 at 24 ("Unum concluded that Plaintiff's condition during the elimination period was not appreciably different from her condition prior to that period when she was working full time.").); (*Id*. at 25 ("Four in-house medical professionals reviewed Plaintiff's claim file. All four noted that, based on the medical records, Plaintiff's conditions had not deteriorated during the elimination period so as to cause her providers to alter their long-standing medical treatment for Plaintiff . . . . Similarly, no significant change in her condition was reflected in the records to warrant a limitation in her duties as a lead instrument technician.").)

On appeal, Clark provided evidence in support of Dr. Capps' finding that, per her Nerve Conduction Report, her neuropathy had worsened in June 2016. (Docket No. 14-3 at 192.) Dr. Donorfio's letter explicitly contradicted Unum's finding that Clark's condition had not worsened. *See* (*id*. at 217 ("This reviewer agrees that the patient has a peripheral neuropathy and there is verifiable progression since 2005 based on her nerve conduction study results of worsening amplitudes, slowing of conduction velocity, and absent F waves that were present in 2005.").) So did the affidavit submitted by Clark's supervisor Robert Grimes, which explained in detail how Clark's condition observably deteriorated in her last few months on the job. (*Id*. at 175.) In its denial of Clark's appeal, Unum noted that Clark suffers from peripheral neuropathy and stated that it had reviewed Dr. Donorfio's letter, but it made no mention of its critical finding that Clark's condition had not worsened. (Docket No. 14-5 at 50.) However, in its briefing, Unum argues that the documents provided by Clark in support of her first appeal—including Dr. Donorfio's letter— actually *support* Unum's original contention that Clark's condition had not changed:

Those records offered a more complete view of Plaintiff's medical condition and, as pointed out by Dr. McAllister's review, **provided further basis for Unum's decision that, [sic] nothing physically changed with Plaintiff's condition** to warrant support for Dr. Brandon's restrictions and limitations during the elimination period, which is the time-period under review.

(Docket No. 18 at 21–22 (emphasis added).) Neither Dr. McCallister's review nor Unum's denial letter engaged evidence that Clark's neuropathy had worsened. Unum physicians provided no alternative analysis of the Nerve Conduction Report. In sum, Unum "never addresse[d] head-on and simply seemed to ignore," *Calvert v. Firstar Fin. Inc.,* 409 F.3d 286, 297 (6th Cir. 2005), evidence favorable to Clark's claim.

### b. Selectively reviewing evidence

"An administrator acts arbitrarily and capriciously when it 'engages in a selective review of the administrative record to justify a decision to terminate coverage.'" *Id*. at 549 (quoting *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007)). Benefits decisions cannot be based on "factually incorrect assertion[s]." *Id*. at 548 (6th Cir. 2015) (citing *Butler v. United Healthcare of Tenn., Inc*., 764 F.3d 563, 568 (6th Cir. 2014)). Unum's April 4, 2017 letter denying Clark's appeal included a host of inaccurate assertions and findings that were subsequently refuted by Clark's supplemental records. Unum stated that Clark's records did not reflect use of long-term steroids or narcotic pain medications. (Docket No. 14-5 at 49–50.) However, Clark has a long-term prescription for Tramadol, a controlled pain medication, and does not tolerate higher doses of some prescribed medications, such as Lyrica. (*Id*. at 160–61.) Clark also had been on a long-term steroid treatment plan but was forced to discontinue use after experiencing side effects. (*Id*. at 178–79.) Unum asserted that Clark had not undertaken ongoing or consistent chiropractic therapy for chronic pain. (*Id*. at 50.) But Dr. Rudder treated Clark 33 times between 2011 and 2016. (*Id*. at 169.) Unum claimed that there was a gap in Clark's rheumatological treatment from

2013 until 2016.  (*Id*. at 50.)  In fact, Clark saw Dr. LaGrone four times in that period.  (*Id*. at 171–74.)  Finally, Unum asserted that Clark was not referred to pain management until late 2016, after she stopped working.  (*Id*. at 50.)  But Clark was referred to pain management on March 18, 2014 for low back and neck pain, on July 16, 2014 for headache, neck pain, and low back pain, and on November 25, 2014 for low back pain.  (*Id*. at 198–214.)

Dr. Norris, Unum's appeal physician, listed all of Clark's supplemental records with brief descriptions in his appeal review.  (*Id*. at 193.)  So did Unum's May 23, 2017 denial letter, which tracked Dr. Norris's review analysis.  (*Id*. at 233.)  But merely restating unfavorable evidence is insufficient to satisfy the arbitrary and capricious standard.  *See Butler*, 764 F.3d at 568 (finding review arbitrary and capricious where the administrator baldly mentioned evidence favorable to the plaintiff but nonetheless concluded that he did not qualify for benefits).  Unum failed to reconcile the discrepancies between its stated reasons for denial of Clark's appeal and Clark's actual treatment history, as documented in the supplemental records.

Dr. Norris made no mention of how, or if, those discrepancies—which bore directly and materially on the frequency and intensity of Clark's treatment—impacted his endorsement of Dr. McCallister's finding that "the available medical records do not reflect the expected frequency/intensity of treatment . . . commensurate with the claimant's reported level of impairment as of 02/15/16 forward."  (Docket No. 14-5 at 192.)  Provided with documentation of Clark's thirty-plus instances of chiropractic treatment, Dr. Norris did not address Dr. McCallister's prior finding that Clark's pain management was inconsistent.  He did not state whether he shared Dr. McCallister's view that Clark's rheumatological conditions were non-severe in light of evidence that there was no gap in her treatment.  He did not revisit Dr. McCallister's finding that Clark had undertaken only mild treatment for her SLE, despite evidence that she was on narcotics,

was restricted from more serious medication options, and had been referred to pain management repeatedly before her elimination period. Instead, in the face of those discrepancies, he made conclusory findings that "[t]he additional clinical information describes ongoing Rheumatologic, Family Medicine, and Chiropractic Care for [fibromyalgia], SLE, OA, and mild degenerative lumbar [disease] [consistent with] previous records," (*id.* at 193), and that the"[t]reatment referenced in the newly received records was generally [consistent with] descriptions of treatment noted in the prior file records." (*Id.*) In failing to address the significant ways in which Clark's supplemental materials augmented the administrative record—and thereby refuted numerous factual bases upon which her first appeal was denied—Unum disregarded unfavorable evidence, a hallmark of selective review. *See Shaw*, 795 F.3d at 549 (finding review arbitrary and capricious where plan physician failed to explain his finding in light of evidence contradicting it).

### c. Failing to conduct its own physical evaluation

"Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious . . . ." *McDonald*, 347 F.3d at 169. However, "[w]hether a doctor has physically examined the claimant is indeed one factor that [the court] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty Mut./Liberty Life Assur. Co.*, 419 F.3d 501, 508 (6th Cir. 2005). Although "reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly . . , the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295.

The Sixth Circuit has also held that, when an employee contends that she is disabled by chronic pain and the governing plan gives the administrator the right to physically examine the employee, discounting the employee's pain without conducting a physical examination "weighs in favor of a determination that the denial of [the employee's] claim was arbitrary and capricious." *See Godmar v. Hewlett-Packard Co.*, 631 F. App'x. 397, 407 (6th Cir. 2015); *see also Shaw*, 795 F.3d at 550 ("Because chronic pain is not easily subject to objective verification, the Plan's decision to conduct only a file review supports a finding that the decision-making was arbitrary and capricious."). "While 'plans generally are not obligated to order additional medical tests, in cases such as this, plans can assist themselves, claimants, and the courts by helping to produce evidence sufficient to support reasoned, principled benefit determinations.'" *Guest-Marcotte v. Life Ins. Co. of N. Am.*, 730 F. App'x 292, 301 (6th Cir. 2018) (quoting *Elliott*, 473 F.3d at 621).

That Unum did not examine Clark supports a finding of arbitrariness and capriciousness. This is especially so, given that Clark suffers from chronic pain. Unum contends that this factor should not militate against it because Clark had the option to order a personal review herself. In support, Unum cites the Sixth Circuit's decision in *Filthaut v. AT&T Midwest Disability Benefit Plan*. 710 F. App'x at 685 (6th Cir. 2017). Unum is correct that the plaintiff maintains the burden of proving her disability, as the *Filthaut* court noted. *Id*. But, despite reiterating that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," the *Filthaut* court found that "the strongest factor weighing in [the plaintiff's] favor is that the Plan neglected to order a physical examination." *Id*.

### d. Heavily relying on physician consultants

"[W]hen a plan administrator's explanation is based on the work of a doctor in its employ, [courts] must view the explanation with some skepticism." *Moon v. Unum Provident Corp.*, 405

F.3d 373, 381–82 (6th Cir. 2005). "The Supreme Court has acknowledged 'that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements.'" *Elliott*, 473 F.3d at 620 (quoting *Nord*, 538 U.S. at 834); *see also Butler*, 764 F.3d at 569 ("United adds that the decision to deny benefits cannot be arbitrary and capricious because five reviewing physicians agreed with it. That reviewing physicians paid by or contracted with the insurer agree with its decision, though, does not prove that the insurer reached a reasoned decision supported by substantial evidence."). The reviewing physicians for Unum in this case were all in-house physicians employed by Unum. Moreover, Unum both determines eligibility for benefits under the Plan, and also pays those benefits out of its own pocket.

### e. **Determination and remedy**

The four *Shaw* factors must be considered in the aggregate. *See Helfman*, 573 F.3d at 396 ("While none of the factors alone is dispositive, we find that as a whole, they support a finding that [the defendant] did not engage in a deliberate and principled reasoning process."). No factor alone justifies a finding that Unum's decision was arbitrary and capricious; however, taken together, they show that Unum's reasoning process was not deliberate and principled. Clark's motion will therefore be granted.

Clark asks the court to order that her claim for ongoing benefits be approved or, in the alternative, to remand the case to Unum for further proceedings consistent with the Plan. As the Sixth Circuit has held, "where the 'problem is with the integrity of [the plan's] decision-making process," rather than 'that [a claimant] was denied benefits to which he was clearly entitled,' the appropriate remedy generally is remand to the plan administrator." *Elliott*, 473 F.3d at 622 (quoting *Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20, 31 (1st Cir. 2005)). Although

31

Clark has identified flaws in Unum's decision, she has not gone so far as to establish that she is clearly entitled to ongoing benefits. Because the discretion to administer the Plan is ultimately still Unum's to exercise, the court will remand the case for further proceedings.

**CONCLUSION**

For the reasons set forth herein, Clark's motion is hereby **GRANTED** and Unum's motion is hereby **DENIED**.

A separate Order will issue.

ENTER this 10th day of October 2018.

_____
ALETA A. TRAUGER
United States District Judge